UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

MARIO CAGGIANO,

                 Plaintiff,

                                            AMENDED COMPLAINT
                                            1:25-cv-02398- NRM-VMS

-against-

THE DEPARTMENT OF EDUCATION
OF THE CITY OF NEW YORK and
THE BOARD OF EDUCATION OF THE
CITY SCHOOL DISTRICT OF THE
CITY OF NEW YORK, Carmen Amador,
Principal of Herbert S. Eisenberg Middle School,
in her official and individual capacity; Audrey Houston,
Assistant Principal of Herbert S. Eisenberg
Middle School, in her official and individual
capacity; Evan Rabinowitz Assistant
Principal of Herbert S. Eisenberg Middle School,
In His official and individual capacity,

                            Defendants.

--------------------------------------------------------X

       The Plaintiff MARIO CAGGIANO, by his attorneys, STEWART LEE KARLIN LAW

GROUP, P.C., respectfully shows to this Court and alleges as follows:

## PRELIMINARY STATEMENT

1.     This is a civil action based upon Defendants' violations of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. Plaintiff brings this action for injunctive and

declaratory relief, compensatory damages (back pay), attorneys' fees, costs and disbursements and

other appropriate equitable and legal relief.  Plaintiff further brings this action pursuant to 42

U.S.C. § 1983 based on retaliation for First Amendment protected speech for his union activities as a United Federation of Teachers ("UFT") Chapter Leader while employed as a teacher for the New York City Department of Education ("NYCDOE") at Herbert S. Eisenberg Middle School ("the School").

2.The conduct complained of in this action involves Defendants' discriminatory and retaliatory conduct against Plaintiff and more favorable treatment exhibited by Defendants towards similarly situated younger gym teachers at the School.

3.Additionally,   the conduct complained of in this action involves Defendants' coercion, retaliation, and interference with Plaintiff's exercise of his First Amendment rights as the UFT chapter leader after and while advocating on behalf of teachers and students at the School.

4.The retaliatory conduct following protected activity includes, but is not limited to, the issuance of adverse performance ratings and evaluations, being subjected to a number of OSI and SCI investigations, disciplinary summons and letters to his employment file, and loss of eligibility for overtime and other per session opportunities, and the commencement of a 3020-a hearing which together constitute adverse employment action.

## JURISDICTION AND VENUE

5.Plaintiff duly filed EEOC charges and a right to sue letter was issued. Plaintiff duly filed charges with the EEOC and this action is commenced within ninety days of receipt (October 25, 2024) of the right to sue letter conferring concurrent jurisdiction on this Court.

6.In addition, this Court has concurrent subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331, as this matter involves federal questions.

7.This action's venue properly lies in Kings County because a substantial part of the acts or omissions giving rise to this action occurred in this District and Defendants are subject to personal jurisdiction in this District.

## PARTIES

8.Plaintiff Mario Caggiano is a resident of Kings County and the State of New York.

9.At all times relevant herein, Defendant New York City Department of Education is a city school district established pursuant to Title II, Article-52-A of the New York State Education Law, NY Educ. Law Section 2590 et seq.

10.At all times relevant herein, Defendant Carmen Amador was the Principal of Herbert S. Eisenberg Middle School, a middle school in Brooklyn, within the New York City Department of Education, and is sued in her official and individual capacity and acting under the color of state law.

11.At all times relevant herein, Defendant Audrey Houston was the Assistant Principal of Herbert S. Eisenberg Middle School, a middle school in Brooklyn, within the New York City Department of Education, and is sued in her official and individual capacity and acting under the color of state law.

12.At all times relevant herein, Defendant Evan Rabinowitz was the Assistant Principal of Herbert S. Eisenberg Middle School, a middle school in Brooklyn, within the New York City Department of Education, and is sued in his official and individual capacity and acting under the color of state law.

## STATEMENT OF FACTS

13. Plaintiff has been a teacher within Defendant NYCDOE since September of 1996 and is presently tenured.

14. In 2015, Plaintiff taught at Herbert S. Eisenberg Middle School, designated IS 303. The School shares a building with K344, Rachel Carson High School for Coastal Studies, and Coney Island Prep Charter School and is located at 501 West Ave, Brooklyn, NY 11224.

15. Beginning in 2015, Plaintiff was elected chapter leader for the School and continued to serve as chapter leader throughout the 2015-2016, 2016-2017, 2017-2018 school years.

16. Also beginning in 2015, Plaintiff was elected chapter leader for the School. He continued to serve as chapter leader throughout the 2015-2016, 2016-2017, 2017-2018 school years.  During these years, Plaintiff did not recall having ever filed a grievance or operational complaint.

17. In this same time span, his professional relationship with Principal Amador, AP Houston, and AP Rabinowitz was very strong and he never once received a disciplinary letter to file or poor performance ratings.

18. Plaintiff received 32 exemplary letters to file, for achievements such as attending a teacher recruitment event on behalf of the school, being in charge of the Middle School District open house which was held at I.S. 303, and organizing a community CPR and First Aid event.

19. In addition to his role as a professional educator within the NYCDOE,from 2015-2019, Plaintiff regularly worked with the CHAMPS after-school program.

20. As a result of the COVID-19 pandemic, the CHAMPS program was not administered for the 2019-2020 school year. This was the first year at the School he did not work with the CHAMPS program.

4

21. While at the School from 2015-2019, Plaintiff consistently received "Effective" ratings and letters of recommendation from his administration, including Principal Amador.

22. In addition to the "Effective" ratings, throughout his time at the School, Plaintiff was afforded the opportunity to facilitate the Kiwanis Builders club and the NYPD Explorers program at the School, for which he received praise from Principal Amador and other members of the administration of the School.

23. Beginning in 2019 and continuing up and until 2022, Plaintiff became very outspoken in his duties as Chapter leader, reporting, among other things, irregular staff program situations, student Individualized Education Plan ("IEP") non-compliance, mismanagement of the school, health and safety violations, and even miscalculation of payments owed to teachers for additional coverages assigned to them during remote instruction during the COVID-19 pandemic.

24. On one such occasion, Plaintiff even brought his concerns regarding improper payment for class coverages due to class overages, and more, directly to Isabel DiMola, Superintendent of District 21, in which the School is located.

25. On December 4, 2021, less than two years after Plaintiff became outspoken in his role as Chapter leader at the School, Principal Amador called Plaintiff into her office and informed him that he was being reassigned from his duties at the School and was to report to 100 Gold Street in Manhattan.

26. During this same conversation, Principal Amador told Plaintiff that she could not provide any additional details with respect to the reassignment to Gold Street.

27. Following the reassignment, Plaintiff filed a NYCDOE FOIL request in or about January 2022 to obtain any information pertaining to the reassignment. On March 21, 2022, the NYCDOE FOIL

office provided a letter response to the FOIL request which indicated that from September 2021-present, Plaintiff had been the subject of seven (7) Office of Special Investigation ("OSI") cases initiated by the school administration.

28. Prior to receiving these FOIL request results, Plaintiff was only aware of one OSI investigation against him, in which AP Audrey Houston falsely alleged that on October 26, 2021, Plaintiff was sleeping during after-school parent engagement time in a locked office.  Plaintiff was not previously aware of these six other OSI cases.

29. After receiving this information through FOIL, on May 24, 2022, Plaintiff asked a UFT representative, Yelena Siwinski, to provide him with the dates and contents of operational complaints and grievances Plaintiff had filed or caused to be filed against the administration, which she did shortly thereafter.

30. Additionally,  on June 1, 2022, Plaintiff asked Robert Levine, a UFT representative, to provide the dates the OSI investigations were commenced, which he did.  Upon comparison of the information provided to Plaintiff by UFT Representative Yelena Siwinski and Robert Levine, he noticed that the dates Plaintiff made operational complaints or filed grievances with the union against the administration closely coincided with the dates OSI investigations the school administrators, including Principal Amador and her Assistant Principals, launched against him

31. For example, on November 5, 2020, Plaintiff pursuant to his responsibilities as a Chapter Leader, filed an operational complaint regarding the remote class size overages at the school in which classes were far in excess of the number of allowable students per remote class.

32. On or about March 23, 2021,  AP Rabinowitz observed Mr. Caggiano's Health. He rated all components as ineffective. This was the first time Plaintiff received all ineffective ratings.

33. As a result of the operational complaint, in an email dated April 7, 2021, District 21 Superintendent Isabel DiMola confirmed that Principal Amador was aware of and had to make retroactive payments to those teachers who taught oversized classes as well as future payments to any teachers who would continue to teach classes that remained oversized.

34. On April 7, 2021, Plaintiff pursuant to his responsibilities as a Chapter Leader, filed another operational complaint against the school administration regarding the type of instruction Principal Amador required teachers to provide in violation of a UFT-DOE agreement during the COVID-19 pandemic.

35. In retaliation, less than a month later, on May 3, 2021, Plaintiff was subjected to an OSI investigation filed against him by the administration. He also received poorly rated "Developing" observation reports from Principal Amador on May 14, 2021, and another "Developing" rating from AP Houston on June 29, 2021, even though he was consistently rated "Effective" and even "Highly Effective" through June 2019.

36. Plaintiff also was denied his preferences for classes for the 2021-22 school year in September 2021, which he had submitted in June 2021, the first time this had occurred at the school. Plaintiff filed a grievance about the denial of his preferences in late September 2021, which resulted in a change to his schedule with no eighth-grade classes assigned to him.

37. On October 21, 2021, Plaintiff pursuant to his responsibilities as a Chapter Leader, filed an operational complaint about the lack of protocols and unsafe conditions during morning student arrival. There were several unsafe conditions, and he was very vocal to parents, administration and the district staff. There were unsupervised students in classrooms and at one point a  dangerous fight occurred in the hallway between students.

38.On October 24, 2021, Plaintiff pursuant to his responsibilities as a Chapter Leader, also filed an operational complaint regarding Physical Education teachers having to create lesson plans for grades 6, 7, and 8.

39.Just two days later, on October 26, 2021, AP Audrey Houston made a report to SCI against Plaintiff, the matter was referred to OSI on November 24, 2021.

40.AP Houston allegedly observed Plaintiff sleeping during after-school time dedicated to parent engagement through the locked PE office door with a small window.

41.Plaintiff learned of this investigation during a May 12, 2022, disciplinary meeting. AP Houston ultimately gave him a retaliatory disciplinary letter, dated May 25, 2022, about this incident, the first disciplinary letter he ever received at this school.

42.Plaintiff was also the subject of yet another OSI investigation reported against him by the school administration on November 15, 2021. He was only aware of this investigation through his FOIL request and subsequent communications with Mr. Levine from the UFT.

43.On December 9, 2021, after Plaintiff's reassignment out of the school, he made an operational complaint against the school on behalf of teacher mentors who were not being paid accordingly.]

44.Additionally, on January 13, 2022, Plaintiff filed an operational complaint based on Principal Amador refusing to pay teachers after school per session pay as per the UFT DOE.

45.Principal Amador was aware of both the December 9, 2021, operational complaint regarding teacher mentor pay, as well as the January 13, 2022, operational complaint for teachers who had not received after school per session work payment, because these complaints required her to retroactively compensate these teachers from the school budget.

46.On February 10, 2022, Plaintiff pursuant to his responsibilities as a Chapter Leader, filed another operational complaint on behalf of teachers who performed asynchronous work for students out with COVID without being paid for it.

47.Shortly after Plaintiff made this complaint, he was subjected to another OSI investigation on April 12, 2022. This OSI investigation came despite the fact that he has not been located at I.S. 303 in nearly 5 months. Plaintiff only aware of this investigation as a result of inquiring with Mr. Levine and his responsive emails indicating the dates of OSI investigations.

48.On April 6, 2022, Plaintiff received an SCI investigatory report which substantiated his alleged failure to supervise students.

49.Only upon reading the report, did Plaintiff learn that AP Houston made three complaints against him. Two of the reports AP Houston made to SCI pertained to student-involved incidents which are ordinary in the course of PE class. The first was a child who fell and was sent to the nurse. The student stated it looked like he was looking down on a phone at his desk. The second was a female student who alleged she had been hit in the head with a basketball by another male student. The SCI report included no dates of when the allegations were made or investigated.

50.Instead of speaking to Plaintiff, he was called into a conference, AP Houston called in an allegation that Plaintiff was late to a remote class. Plaintiff believes that he was the only teacher that OSI was called for being late to a remote class.

51.Upon information and belief, there is at least one other outstanding OSI investigation of which he would have been unaware if not for his FOIL request, as well as two (2) Office of Equal Employment Opportunity ("OEO") investigations that are currently ongoing.

9

52. Furthermore, on June 13, 2022, Plaintiff found out that he was not selected to work summer school despite being the most senior Physical Education teacher within I.S. 303 and never had never previously been denied the opportunity to work summer school.

53. In addition to the poor performance ratings, disciplinary letters to file, and ultimate reassignment out of the school, during the time that he was vocal in his duties as chapter leader, Principal Amador made a number of comments demonstrating her anti-union animus.

54. On or about March 28, 2021, Plaintiff raised concerns to Principal Amador during a School Leadership Team ("SLT") meeting. At this meeting, he spoke up about a math class that was being taught by a social studies teacher. He asked why two of the Assistant Principals who are licensed in math could not teach this course.

55. On or about September 24, 2021, Principal Amador said to Plaintiff "I'm vested," implying that even if the conduct he complained about as UFT Chapter leader resulted in her termination, she would still receive her pension.

56. Additionally, on or about October 6, 2021, Principal Amador made another comment stating, "the UFT gets its say, not its way." Once again this comment clearly depicts Principal Amador's anti-union sentiment and supports the fact that he was retaliated against as a result of his status as a vocal UFT chapter leader.

Discrimination on the Basis of Age

57. In addition to the retaliatory treatment, Plaintiff has faced as a result of his status as a Chapter Leader, while at the School he also noticed that he was treated less favorably than Mr. Egzon Gjonbalaj, a younger long-term substitute teacher who often covered physical education classes within the School.

10

58. Plaintiff was born in April 1972.

59. Upon information and belief, Mr. Gjonbalaj (approximately 25 years old) was not given poor disciplinary ratings, as Plaintiff was. Mr. Gjonbalaj also was not subjected to numerous frivolous investigations alleging misconduct resulting in disciplinary letters to file such as was. In three years as a substitute Dean, despite never teaching PE in the school, Mr. Gjonbalaj was given three years credit as a PE teacher.

60. Furthermore, instead of following standard procedures such as initiating a discussion, holding a conference or meeting, issuing a letter to file, or conducting a UFT disciplinary conference—which are customary for both minor and serious complaints—the employer took adverse actions against the Plaintiff. Rather than adhering to these established protocols, the administration escalated routine matters by initiating investigations, including referring him to the Office of Special Investigations (OSI) for alleged lateness to class.

61. For six consecutive years, the Plaintiff had consistently received "Effective" ratings. However, following the hiring of Egzon Gjoncalaj as a third physical education teacher, despite there having been only two PE teachers for the past ten years with an enrollment of 420 students (a number sufficiently served by one or two teachers), the plaintiff began to experience discriminatory treatment.

62. Notably, Mr. Gjoncalaj was less qualified. The plaintiff holds multiple professional credentials, including New York State certification as an Alcoholism and Substance Abuse Counselor, certifications as a personal trainer, First Aid and CPR instructor, conflict mediation specialist, certified coach, and possesses extensive teaching experience.

63.Mr. Gjoncalaj bypassed the teacher-led hiring committee, a clear violation of established school hiring practices that had been previously approved and voted upon by staff. This action, which directly disadvantaged the plaintiff, was a result of age discrimination.

64. Importantly, there was no staffing need for a third PE teacher, as the school already employed two for an enrollment of only 420 students—well below projections and not supported by the budget. The fact that the principal bypassed the hiring committee provides direct evidence of discriminatory intent.

65.In addition, Mr. Gjoncalaj did not possess a permanent teaching license, holding only a substitute license, while the plaintiff was reassigned duties that resulted in significant professional and financial harm.

66.Specifically, the plaintiff lost his coaching position and related opportunities, amounting to a wage loss of approximately $5,000 to $15,000 annually. The less-qualified, less-senior teacher was given preferential treatment, including a lighter teaching load and his preferred grade-level assignment, while the plaintiff was assigned to teach Health—a subject outside his license area— which required him to file a grievance.

67.The role of age in this matter is further demonstrated by salary disparities: younger teachers are paid approximately $70,000 annually, whereas the plaintiff, with decades of experience, earns $130,000 annually.  Mr. Gjoncalaj is less qualified and the school enrollment was below projection (420 enrollment) the school cannot fill his program with classes therefore, there was no need to hire him.

68.The discrimination, retaliation and hostile work environment was ongoing.    Plaintiff was repeatedly summoned to the Principal's office during his contractual preparation periods, lunch

breaks, and administrative periods to discuss both teaching responsibilities and union-related business. The Principal further disregarded professional boundaries by contacting Plaintiff outside of school hours.

69. In addition, despite Plaintiff's long history of "effective" performance ratings, once he became active in union matters, he was unjustifiably issued a "developing" rating and subjected to other adverse evaluations. These actions were retaliatory and not based on his actual teaching performance.

70. The administration failed to provide support when students cursed at or threatened teachers, thereby creating an unsafe and hostile work environment. Rather than addressing student misconduct, the Principal fostered a culture of insensitivity.

71. The Principal made discriminatory remarks about Plaintiff's national origin and age, stating, "Why are you acting Italian? You are a loud Italian." The Principal further mocked Plaintiff's tone and accent as being "too Italian," and made ageist comments such as, "You are too [old] to go to the third floor."

72. As a direct result of this discriminatory conduct, Plaintiff was treated for mental health conditions caused by stress, humiliation, and intimidation in the workplace.

73. Plaintiff was also subjected to disparate treatment based on his age. Although he was directed to attend workshops on the use of technology in the classroom, opportunities for leadership and professional advancement tied to those workshops were given instead to a newly hired, younger physical education teacher.

74.Plaintiff was systematically denied opportunities for professional growth. He was excluded from leading workshops, after-school meetings, and committees related to professional development. Leadership roles were not distributed fairly and consistently excluded Plaintiff.

75.The Principal further engaged in intimidation tactics by refusing to provide Plaintiff with the required pre-observation conferences, depriving him of a fair evaluation process.

76.In violation of the collective bargaining agreement, the administration required staff, including Plaintiff, to respond to work-related emails outside of regular school hours, further contributing to the retaliatory and hostile work environment.

77.The administration showed preferential treatment to a younger, 25-year-old physical education teacher, Egzon Gjonbalaj. Unlike Plaintiff, Mr. Gjonbalaj was assigned only 19 classes per week, well below the contractual requirement of 25. No other teacher in the school was permitted to carry fewer than 25 classes.

78. Mr. Gjonbalaj was also granted his teaching preferences, while Plaintiff was denied the same consideration. In further violation of the union contract, Mr. Gjonbalaj was allowed to leave work early in exchange for covering the morning café duty, a special perk that was never voted on or approved by staff.

79.In addition, Mr. Gjonbalaj's classes were staffed with fewer students than those assigned to Plaintiff and the other teachers, further demonstrating disparate and preferential treatment based on age and favoritism

80. Moreover, the plaintiff was unjustly reassigned to an office at 100 Gold Street, a move that further demonstrated adverse treatment. It is worth noting that in nine years of service, incidents such as a student being injured in PE were never reported to OSI, yet the plaintiff was subjected to such scrutiny. His personnel file includes numerous commendation letters from his principal, providing further evidence of his exemplary service and underscoring that there was no legitimate justification for hiring a less-qualified third PE teacher.

81. The younger teacher Gjoncalaj was awarded the plaintiff's after-school coaching position, despite lacking both experience and retention rights. The plaintiff had previously earned $50 per hour in this role, which had been a consistent part of his professional responsibilities. Following his reassignment, the plaintiff was prevented from teaching and coaching after school, resulting in the loss of approximately $12,000 annually in additional overtime income. This displacement in favor of a less qualified, younger teacher serves as a clear example of discriminatory treatment.

**First Amendment Activity, continuing Hostile Work Environment and retaliation**

82. Moreover, Plaintiff consistently spoke out on issues of public concern relating to the education, safety, and well-being of students, particularly students with special needs.

83. He raised concerns regarding the lack of compliance with special education requirements and the inadequate support for special education students at PTA meetings, which are open to the public.

84. Plaintiff spoke at school board meetings attended by the general public, as well as at CEC meetings and monthly School Leadership Team meetings, all of which are public forums that must be advertised and open to community members.

15

85. Plaintiff also used public social media groups to advocate as a community member, parent, educator, and activist, amplifying concerns about school safety, discipline, and compliance with educational standards.

86. He publicly addressed issues such as students' unrestricted use of cell phones during instructional time, the presence of unruly and undisciplined students, and the failure to provide licensed teachers in critical subject areas such as mathematics and English Language Arts.

87. Plaintiff voiced these concerns not only in internal school meetings, but also in forums where parents, students, and community members were present, ensuring his speech reached beyond the workplace and into the broader public sphere.

88. Plaintiff also emailed the Superintendent to advocate for at-risk children and students with special needs, clearly acting in his capacity as a concerned citizen and community advocate rather than merely as an employee.

89. As a direct act of retaliation for Plaintiff's protected speech, the administration contacted OSI and SCI to initiate baseless investigations against him.

90. Plaintiff was deprived of compensation to which he was entitled, including payment for teaching remote, asynchronous, and live classes, as well as extra coverage pay for teaching additional periods.

91. Plaintiff was deliberately excluded from meetings in which he was required to participate as a UFT Chapter Leader, thereby undermining his union role and retaliating against him for his advocacy.

92. The school filed frivolous allegations against Plaintiff and served him with disciplinary charges under Education Law § 3020-a seeking his termination. These charges were unfounded and designed to intimidate Plaintiff and deter him from exercising his First Amendment rights.

93. Plaintiff was further subjected to directives not to speak at public forums, including PTA meetings, and was reassigned out of his school building, preventing him from attending and participating in such public meetings.

94. As a result of the retaliatory campaign, Plaintiff endured extreme stress and mental health deterioration, requiring hospitalization during the pendency of the 3020-a proceeding. While the matter was placed on hold after one pre-hearing, it remains unresolved and may resume at any time, continuing to inflict harm on Plaintiff.

95. The adverse employment actions described herein—including the initiation of frivolous investigations, denial of compensation, exclusion from union and school leadership meetings, filing of baseless disciplinary charges, reassignment, and silencing directives—constitute retaliatory conduct that would deter a person of ordinary firmness from exercising his free speech rights.

96. Plaintiff's outspokenness and advocacy on behalf of children with special needs, at-risk students, and the broader school community were matters of public concern. Plaintiff spoke as a citizen, not merely as an employee, and there is a direct causal connection between his protected First Amendment speech and the discriminatory and retaliatory actions taken against him.

97. Further, on or about June 15, 2022, while reviewing the School's Excessing Seniority List, Plaintiff noticed that he was not listed on the school roster at all. Instead, Mr. Gjonbalaj was listed

as a Physical Education teacher on the roster. This list details the staff within the school and their respective seniority within the School.

98. As Plaintiff was still assigned to the School, despite his reassignment, this appears to be an attempt by the DOE to alter Plaintiff's seniority status.

99. The discriminatory and retaliatory treatment Plaintiff experienced were due to his age and First Amendment activity.  The adverse employment actions and retaliation came in the form of loss of job opportunities, assignments and income previously available to him, poor ratings, disciplinary letters to file, and frivolous disciplinary investigations, etc., which ultimately led to his removal from the school was done in an attempt to replace him with a younger, less senior teacher.

100. Further, since his reassignment, as a result of the retaliatory and discriminatorily motivated poor ratings, investigations, and disciplinary letters Plaintiff has been subjected to, he is unable to work the CHAMPS after-school program, as well as any other per-session opportunities

101. Finally, in addition to the fiscal damage resulting from Respondent's retaliatory and discriminatory conduct, Plaintiff has also suffered damage to his professional career and reputation as a result of being removed from his position at the School.

102. Plaintiff engaged in protected activity by the filing of a discrimination and retaliation lawsuit against the New York City Department of Education on September 6, 2022. (USEDNY 22-cv-3853, discontinued without prejudice by Plaintiff on July 21, 2023).

103. In a further act of discrimination and retaliation, on June 23, 2023, Respondent served charges and specifications against Plaintiff pursuant to Education Law 3020-a seeking his termination, based upon the above-stated baseless allegations of misconduct.

104. In retaliation for Plaintiff's protected activity, the Principal repeatedly contacted the Office of Special Investigations ("OSI") and the Special Commissioner of Investigation ("SCI") to file baseless and frivolous reports against him.

105. For example, OSI was called with the allegation that Plaintiff was conducting union business during instructional time. This allegation was unsubstantiated.

106. OSI was also called with the claim that Plaintiff picked up his child during work hours. This allegation was likewise unsubstantiated.

107. On another occasion, OSI was contacted because Plaintiff allegedly had his head down in a locked classroom for approximately ten minutes. Rather than following common sense procedures—such as making an announcement over the loudspeaker, opening the door, speaking to Plaintiff, or inquiring whether he was well—the administration bypassed all ordinary steps and called OSI with yet another frivolous charge.

108. Plaintiff was also targeted with an OSI call alleging that he was late to class. Again, the administration never spoke to Plaintiff, never issued a letter, and never afforded him due process before escalating the matter.

109. Every time Plaintiff filed an operational complaint or grievance, the Principal retaliated by following it with an OSI or SCI complaint.

110. This pattern was unprecedented. For eight years, Plaintiff had received over twenty-five commendation letters and never once received a "developing" rating. However, in the same year that Plaintiff began filing operational complaints and grievances, he suddenly received his first "developing" rating, accompanied by a series of OSI and SCI complaints.

19

111. In all the years that Plaintiff refrained from filing operational complaints or grievances, the Principal never called OSI or SCI. Yet in the two years when Plaintiff exercised his rights by filing such complaints, the Principal repeatedly subjected him to retaliatory OSI and SCI investigations. The timing and pattern demonstrate that these investigations were not coincidental, but direct acts of retaliation.

112. The Education Law 3020-a proceeding is currently ongoing

113. By reason of the foregoing Plaintiff has been retaliated against based on retaliation for his First Amendment protected speech for his union activities as UFT Chapter Leader,

pursuant to 42 U.S.C. Sec. 1983. Plaintiff has further been discriminated against and retaliated against based on his age, and due to his prior complaints of discrimination, including the commencement of his federal lawsuit in violation of the ADEA.

114. The discrimination and retaliation (hostile work environment and disparate treatment) Plaintiff has been subjected to has been continuing in nature, up to and including the commencement of the still ongoing Education Law 3020-a proceeding.

115. Plaintiff has suffered loss of pay and benefits, pain and suffering and damage to his reputation.

116. Plaintiff is currently not working in his former capacity, has been reassigned and to date the 3020A hearing is still pending.

## FIRST CLAIM FOR RELIEF

(Violation of 42 U.S.C. Section 1983
First Amendment Retaliation against all Defendants)

117. Plaintiff repeat and reallege all the preceding paragraphs of this complaint, as if fully set forth herein.

118. Defendants, through the aforementioned conduct, have violated 42 U.S.C. Section 1983, by retaliating against Plaintiff for advocating for other staff members of the school as well as students as a Union Chapter Leader in violation of the First Amendment.

119. Defendants were acting under the color of state law at all times relevant.

120. Plaintiff pursuant to his responsibilities and affiliation with the Union as a Chapter Leader was speaking as a citizen on a matter of public concern a number of instances, such as when he filed a complaint on November 5, 2020, regarding class size which exceeded limits, on October 21, 2021, Plaintiff filed another complaint pertaining to lack of protocol for the morning arrival of students, when he spoke up about teachers teaching out of license and when he spoke up against changing a student's IEP. These and other complaints were not made pursuant to his position as physical education teacher but as a Chapter Leader, on behalf of the Union to address the quality of education and safety provided to the students of the School.

121. Due to Plaintiff's affiliation with the UFT, Defendants took adverse employment actions against Plaintiff in a number of ways which include but are not limited to, subjecting him to multiple investigations, disciplinary letters to file, and poor performance reviews making him ineligible for summer school work and per session opportunities costing Plaintiff thousands of dollars.

122. Ultimately, as a result of the investigations, disciplinary letters, and poor performance reviews he was reassigned out of the school to 100 Gold Street and a 3020-a hearing was commenced.

123. As a proximate result of Defendants' retaliatory actions against Plaintiff, he has suffered and continue to suffer a loss of monetary damages, humiliation, severe emotional distress, mental and

physical anguish and suffering, and damage to his professional reputation and potential loss of employment, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**(Violation of the ADEA-DOE ONLY)**

124. Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

125. Plaintiff has been treated differently than a similarly situated, younger counterpart at the School. Specifically, Plaintiff has received disciplinary letters to file, less-than-effective observation reports, and been the subject of a number of investigations. These documents have been issued to be pervasively and continuously for the past two-plus years.

126. Plaintiff at all times performed his duties satisfactorily and in a similar fashion to his younger counterpart.

127. Plaintiff also had his seniority status tampered with.

128. Upon information and belief, Defendants have undertaken a constant and pervasive practice of targeting him in an attempt to reassign him from the School and replace him with a younger counterpart.

129. As a proximate result of Defendants' discriminatory actions against Plaintiff, he has suffered and continues to suffer a loss of monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation and potential loss of employment, in an amount to be determined at trial.

130. Plaintiff has been subjected to disparate treatment, a hostile work environment and a discriminatory and retaliatory termination based on her age in violation of the Age Discrimination in Employment Act of 1967.

WHEREFORE, Plaintiff prays that judgment be entered that exceeds the minimum jurisdiction of this Court as follows:

A.      A declaratory judgment that Defendant District is in violation of federal Age Discrimination in Employment Act (ADEA);

B.      A declaratory judgment that Defendant District is in violation of 42 U.S.C. § 1983 based on retaliation for First Amendment protected speech;

C.      Awarding Plaintiff compensatory damages (including but not limited to emotional distress damages) and punitive damages (to the extent available) pursuant to 42 U.S.C. § 1983,

D.       Granting compensatory damages including but not limited to back pay and lost wages;

E.      Granting compensatory damages for injuries and accompanying pain and suffering for a hostile work environment, and retaliation;

F.   Punitive Damages

G. Attorney's fees, costs and disbursements;

H. Any other relief that is just and equitable.

**PLAINTIFF HEREIN DEMANDS A TRIAL BY JURY**

Dated: New York, New York
            January 20, 2025                                      Respectfully submitted,

                                                                                STEWART LEE KARLIN
                                                                                LAW GROUP, PC

/s/Stewart Lee Karlin
STEWART LEE KARLIN, ESQ.
Attorney for Plaintiff
111 John Street, 22nd Floor
New York, NY 10038
(212) 792-9670

**VERIFICATION**

STATE OF NEW YORK     )

COUNTY OF NEW YORK)     ss.:

     I, the undersigned, an attorney admitted to practice in law in the Courts of New York State, state that I am the attorney of record for the Plaintiff in the within action;  I have read the foregoing, Complaint, and know the contents thereof; the same is true to his own knowledge except as to those matters therein alleged to be on information and belief, as to those matters I believe to be true.

     The reason this verification is made by your affirmant and not by the Plaintiff herein is that said Plaintiff resides in a county other than the county where your affirmant maintains his law office.

     The grounds of your affirmant's belief as to all matter not stated upon his own knowledge are as follows:

     Conversations with the Plaintiff and information contained in the file.

Dated:  New York, New York
     September 05, 2025

                         _s/ Natalia Kapitonova_
                         NATALIA KAPITONOVA, ESQ.

**ATTORNEY CERTIFICATION**

Pursuant to 22 NYCRR, Section 130-1.1.A the undersigned, an attorney duly admitted to practice law in the Courts of the State of New York, respectfully affirms the truth of the following statement under the penalties of perjury pursuant to the C.P.L.R.:

The undersigned attorney hereby certifies that to the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of the papers (s) or the contents therein are not frivolous as defined in Subsection C of Section 130-1.1.

Dated:  New York, New York
            September 05, 2025

                                            _s/ Natalia Kapitonova_
                                            NATALIA KAPITONOVA, ESQ.